(No. 22832.

ELIZABETH M. THOMAS, Appellee, *vs.* EUGENE THOMAS, Appellant.

*Opinion filed October 14, 1935.*

ROSE & SYMMES, CHARLES P. MOLTHROP, and RAYMOND F. KELLY, (JOHN A. ROSE, of counsel,) for appellant.

RATNER, CHAPMAN & RATNER, (DAVID J. RATNER, and GEORGE J. MILLER, of counsel,) for appellee.

Mr. JUSTICE SHAW delivered the opinion of the court:

The appellee, Elizabeth M. Thomas, filed her complaint against the appellant, Eugene Thomas, in the superior court of Cook county, whereby she sought a divorce on the grounds of cruelty and drunkenness, and also sought the cancellation of certain deeds and assignments from her grandmother, Mary E. Steward, and the cancellation of certain of her own deeds whereby she had placed her husband in joint tenancy with herself as to certain properties owned by her. The husband answered denying all charges, and by way of counter-claim prayed for partition of that property in joint tenancy. In this opinion the wife will be referred to as "plaintiff" and the husband as "defendant." The trial court entered a decree in favor of the plaintiff, granting her all the relief prayed and reserving all questions of alimony and expense for further consideration. This decree determines the title to several freehold estates, and the appeal is therefore direct to this court.

The decree made the following finding of facts: That the parties were married on December 4, 1929, and that there were no children of the marriage; that plaintiff always conducted herself properly toward her husband; that prior to her marriage she had resided with her grandparents, Dr. Francis M. Steward and Mary E. Steward, who were possessed of considerable means. The decree further found that in May, 1929, Dr. Steward created a trust, which consisted of all his real and personal property. Thereafter, in November, 1929, he died, leaving Mary E. Steward his widow and the plaintiff herein his only heirs. Under the terms of this trust it was provided that upon the death of Dr. Steward $50,000 should be set aside and held in trust for Francis Marion Rank, a son of the plaintiff by a former marriage, until the age of thirty and then delivered over. It was further provided that after setting aside this sum of $50,000 the remainder of the estate should be divided into two equal portions, to be determined by the

trustee in its discretion, one to be known as the Mary E. Steward portion and the other as the Elizabeth Thomas (*nee* Rank) portion. The trustee was required to make immediate delivery of the Mary E. Steward portion to her. As to the Elizabeth Thomas portion, it was provided that if her share should be less than $50,000 it should be paid to her immediately. It was further provided that if Elizabeth Thomas should permit the payment to her of $50,000, the remainder should be held in trust for her for a further period of five years if the widow, Mary E. Steward, should live that long, but to be paid to Elizabeth Thomas immediately upon the death of Mary E. Steward within the five-year period.

The court further found that after the marriage the plaintiff and the defendant resided with Mrs. Steward in her home until June 1, 1933; that shortly after the marriage the defendant entered upon a course of cruelty, threats of death and various acts of physical violence, whereby he placed himself in a position of dominance over the other members of the household; that on May 15, 1930, without cause, he struck the plaintiff with his fist, thereby breaking her glasses and knocking her down, and in July, 1932, at a resort at Momence, Illinois, he beat her without any cause; that on February 14, 1932, he presented to the plaintiff a number of blank deeds and assignments mixed in with apartment leases and demanded that she have Mrs. Steward sign them; that the plaintiff refused to do this, whereupon the defendant beat her until she became so fearful of her life that she agreed to his demands; that the plaintiff thereupon presented the legal blanks to Mrs. Steward, telling her they were leases for apartments, and Mrs. Steward, who was then eighty-two years of age, signed all of the papers without knowing she had signed deeds and assignments along with the leases; that the defendant locked all these documents in his trunk, from which the plaintiff later removed them and destroyed

them; that upon discovery of the destruction of these documents the defendant again beat the plaintiff, breaking her arm and refusing to procure any medical care for her and that she was compelled to go to a hospital for treatment; that again, on May 1, 1933, he beat the plaintiff and by intimidation compelled her for the second time to mix deeds and assignments in with apartment house leases and get them signed by Mrs. Steward; that the defendant retained possession of such deeds and assignments and threatened the plaintiff with serious consequences should she again attempt to destroy them.

Mary E. Steward died on May 31, 1933, and on the same day, but after her death, a notary public was procured who filled out and executed the acknowledgments on the deeds and assignments and had the deeds witnessed by Ella Thomas, a sister of the defendant, and James Steigel, who had not seen them executed. The deeds and assignments were recorded on June 1, 1933. Mrs. Steward never received any consideration for any of the documents, never knew that she had signed any such instruments and never intended to make any such conveyances or assignments. There is a dispute between the plaintiff and the defendant as to just when their names were filled in as grantees and assignees in these instruments and as to just who wrote the legal descriptions into the blank instruments and just when it was done. The trial court found they were all entirely void.

The court further found that in March, 1933, the corporate trustee of the plaintiff's estate resigned and the defendant procured his own appointment as trustee; that thereafter, in June, 1933, upon the death of Mrs. Steward, it became his duty, under the terms of the trust agreement and as successor in trust, to transfer all of the properties remaining in the trust to his wife; that he refused to do this, but, on the contrary, adopted a course of cruelty and threats for the purpose of causing her to consent to having

the property placed in joint tenancy with him, and that after threats and a severe beating she consented to his plan. The court found that this action on her part, which was consummated on July 5, 1933, by deeds through an intermediary, was not the free and voluntary act of the plaintiff, but was, on the contrary, induced by apprehension and such fear of bodily injuries as amounted in law to duress, and that she received no consideration from him other than promises to desist from his acts of cruelty. The court further found that after the execution of the deeds to the trust estate, in September, 1933, the defendant beat, struck and pinched the plaintiff, and again, in January, 1934, he struck her with his fists and a black-jack. There was also a finding against the defendant of habitual drunkenness.

Under three assignments of error the defendant argues that the grounds for divorce were not proved by a preponderance of the evidence; that as to both charges the parties were equally at fault; that his drunkenness was induced by his wife through invitation and example; that the charge as to the filling in of the deeds, which were signed in blank by Mary E. Steward, amounted to a charge of forgery and required proof beyond a reasonable doubt, and further, that the plaintiff participated in that fraud and therefore did not come into court with clean hands. Also, that the court erred in setting aside the deeds through the intermediary conveying the trust estate to the parties in joint tenancy, for the reason that the facts testified to by the plaintiff did not constitute duress, and for the further reason that the facts found by the chancellor were not established by a preponderance of the evidence.

While the parties agreed, and the evidence is in harmony as to some of the facts involved, as to all material matters of any grave import the evidence is highly conflicting and the facts subject to bitter dispute. The testimony of the plaintiff and the defendant is directly contradictory each of the other and cannot be reconciled on any material

point. The same is true of much of the corroborative testimony offered by the respective parties. Without attempting a review of the entire record of 1500 pages we will cite a few instances of the nature of the evidence.

The plaintiff testified to a beating received on May 15, 1930. Mary Murphy corroborated this in part, testifying to seeing the plaintiff the following day in bed, with her face bruised and her mouth cut. The defendant denied this occurrence. Mary Murphy also testified to seeing the defendant strike the plaintiff in November of 1930 while he was drunk, and that he followed the plaintiff from room to room in the house, striking her continuously; that on that same evening he left the house, locked the door, and re-entered by crashing through the plate-glass door. The defendant denied all of these statements. The plaintiff, Grace Conkey and Mary Murphy testified to an occasion when the defendant, while drunk, smashed pictures and furniture, knocked down a chandelier, smashed a radio against a radiator, broke vases and other things, and then beat the plaintiff. The defendant denied these entire transactions. The plaintiff and Mary Murphy testified to another occasion in September of 1931 when the defendant, while drunk, used vile language and threw dishes containing food against the wall. This was also denied by the defendant. Two other witnesses corroborating the plaintiff were Loretta Walsh and her brother Dr. Walsh, and a third was Barton Clingman. The witnesses Loretta and Dr. Walsh testified to an occasion when the defendant directed a stream of vile language toward the plaintiff, which was denied by the defendant, and the witnesses Clingman and Dr. Walsh told of another occasion when they said the defendant was drunk, and after crashing his car into a viaduct gave the plaintiff a beating. They also told of a further beating after arriving at the home of the parties later in the evening, which was likewise denied. The plaintiff testified to a visit to a tavern in June, 1933, accom-

panied by her husband and also by Dr. and Loretta Walsh. It was her statement that her husband became so drunk that he lost consciousness, was taken home and lay on the floor all evening, drunk. She further testified that Dr. Walsh took care of her husband all night and administered a hypodermic to quiet him. Dr. Walsh corroborated her testimony, but the defendant testified that although he had been at the place in question, he was not drunk and did not receive any treatment from Dr. Walsh.

Numerous other similar occasions are mentioned in the testimony exemplifying similar sharp conflicts in the evidence, but we can perceive no occasion for mentioning more than one other. This concerned an occasion when the plaintiff's arm was admittedly broken under circumstances in dispute. She testified that on October 3, 1932, she removed from the defendant's trunk certain documents to which she had procured her grandmother's signature under circumstances hereinabove set forth and destroyed them; that on October 5, 1932, the defendant, while drunk, discovered that the documents were missing and started to beat her; that he seized her in his arms, and that in the ensuing struggle her left wrist was broken; that she waited for daylight and then called Dr. Walsh, who took her to the hospital, secured an assistant and set the arm. Dr. Walsh testified to the call and the surgical procedure, as did others. It was the defendant's version of the affair that the plaintiff broke her arm while trying to hit him; that he dodged the blow and she struck her arm against a trunk and in that manner broke it. In this he was corroborated by a witness who claimed to have been in the home at that time in the early morning, but this corroborating witness was pointedly impeached. A witness, John Robertson, who appears to have been disinterested, testified to seeing the defendant's corroborating witness at a point in the city a considerable distance away at the time of the occurrence.

We have quoted enough of the evidence to indicate the sharp and irreconcilable conflict which pervades it. The public interest does not require, nor will this opinion permit, any further review of the facts. We would only add certain pertinent points. The defendant's own testimony shows that he operated a typewriter and was accustomed to filling out leases for the apartments in buildings owned by the grandmother; that a few days before the fraudulent deeds and assignments were executed he made a purchase at a stationer's store where blank forms of deeds and assignments exactly like those used for the fraudulent transaction were sold, the purchase amounting to $3.25. His wife was with him on this occasion and testified that he bought the blank deeds and assignments at that time, while he testified that he bought a stapling machine. He admitted in his testimony that in the month the deeds were fraudulently procured he had written a letter to a correspondent in South Dakota inquiring about the status of joint tenancies in that State, and that either by or at the suggestion of his South Dakota correspondent the words "love and affection" had been added to the consideration of one dollar mentioned in the South Dakota deed. He testified that this correspondence concerning the South Dakota land was at the request of the grandmother, but this is totally irreconcilable with his further testimony that he knew nothing of the deeds or assignments before their execution. It was his story in this behalf that his wife had given him the whole bundle of deeds and assignments, all fully executed, which was a great surprise to him; that he had then gone to the grandmother, who told him she wanted it that way because of her great love for him and her confidence in him, and requested only that he do nothing with them until after her death.

On the whole record we are of the opinion that the chancellor could not have come to any other conclusion than he did. It is most significant that the plaintiff had

nearly a quarter of a million dollars to lose through the joint tenancy arrangement and nothing to gain by it. Had there been no deeds or assignments she would have inherited the whole estate of her grandmother, being the only heir. The only effect of the joint tenancy arrangement was to cut her inheritance in half. It is inconceivable that she should plot to this end except through an intermingling of love for and fear of her husband. That she did so is apparent.

We have above indicated our concurrence in the findings of facts as made by the chancellor, and there remains only to be considered the correctness of his application of the principles of law to those facts. We will consider first those deeds, through an intermediary, by which the husband was placed in joint tenancy with the wife of her trust estate. The chancellor found that the plaintiff's part in this transaction was induced by and carried out under duress. The defendant devotes a long argument and the citation of much authority to a contention that the facts do not amount to duress in law. We consider it unnecessary to discuss this point or these authorities because it is immaterial and unnecessary to a decision of this case. The chancellor found, and the evidence supports the finding, that it was one of the considerations for these deeds that the defendant would desist from his course of cruelty toward the complainant and in the future treat her with kindness, love and forbearance. The chancellor found, and the evidence supports the finding, that the defendant, after securing these deeds, continued his acts of cruelty, and about six months after their date administered to the plaintiff a severe beating, which compelled her to leave their home. These facts are a sufficient ground for setting the conveyances aside in a court of equity. The facts are somewhat similar to those in *Coonce* v. *Coonce*, 296 Ill. 585, *Brixel* v. *Brixel*, 230 id. 441, *Fischer* v. *Fischer*, 245 id. 426, and *Wiederhold* v. *Wiederhold*, 305 id. 429, in each of which

deeds between husband and wife were set aside. In the latter case we said: "The uncontradicted evidence in the record shows that the conveyances in question were made in consideration of appellee's promises to treat appellant kindly and discharge her duty to him as his wife, and it also shows that she did not fulfill her marital obligations but that she continued a course of conduct which would naturally lead to separation. A court of equity has ample power to relieve against such a fraud as is shown by this record, and we are impressed with the conviction that that power ought to be exercised in this case." In *Coonce* v. *Coonce, supra,* we pointed out, as we previously pointed out in *Fischer* v. *Fischer, supra,* that the marital relation affords no immunity from the consequences of fraud practiced by either party upon the other. Although citations might be multiplied and quotations extended, we consider the chancellor's ruling on this branch of the case so clearly within the foregoing principles as to require no further discussion.

It is equally clear that the chancellor was right in his ruling as to the deeds and assignments. He was not dealing with a question of setting aside valid instruments, such as would be and remain in full force until voided, but with documents which had never known the breath of life. No matter when or by whom the names of the grantees and the descriptions in these instruments were filled in, the proof showed, and the chancellor found, that Mary Steward never knew she had signed them, and the effect in law is thus the same as though she never had. No case has been cited to us in which the clean hands doctrine has been carried to the extent of validating an instrument as a deed which had never been signed, which is what the defendant would have us do and thus defeat equity by one of its own rules. It has been held in this State that the right to void an apparently valid instrument descends to the heir-at-law of the grantor, and thus in this case would reside in the

plaintiff. (*Warner* v. *Flack,* 278 Ill. 303.) It has also been held that if the parties do not stand *in pari delicto* but the circumstances are such that the guilt of one is far greater than that of the other, a court of equity may, in its discretion, interpose its power and grant relief. (*Baehr* v. *Wolf,* 59 Ill. 470.) The case before us aptly illustrates a suitable occasion for the application of these rules.

There are two further contentions in the defendant's brief which require notice. It is urged that the plaintiff is guilty of *laches* in not sooner denouncing the frauds to which she has been subjected, and it is also argued that if the intemperate habits of the defendant were induced by the example and invitation of the complainant she should not be granted a divorce on that ground. Both the facts and the law are against the defendant in these contentions. No unreasonable time expired prior to the commencement of this suit, and the record shows that the complaint was filed immediately upon the separation of the parties, which was the termination of the defendant's dominance over the plaintiff. So far as the question of drunkenness is concerned, it could make no difference what the ruling might be, as the cruelty shown was sufficient ground for divorce in any event. On this point, however, we consider the findings of fact made by the chancellor sufficiently broad to absolve the wife from any such charge. Each of these defenses is of such a nature as to be unavailable unless specially pleaded, and there having been no such pleading can not be considered. *Evans* v. *Tabor,* 350 Ill. 206; *Johnson* v. *Johnson,* 114 id. 611.

The decree of the superior court of Cook county will be affirmed.